Filed 12/20/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ARIEL RUIZ et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU et al.,<br><br>     Defendants and Respondents. | A136275<br><br>(San Francisco City & County Super. Ct. No. CGC-07-459600) |
| ARIEL RUIZ,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU et al.,<br><br>     Defendants and Appellants. | A136395<br><br>(San Francisco City & County Super. Ct. No. CGC-07-459600) |

**I.**

**INTRODUCTION**

In this consumer class action, the parties entered into a settlement agreement (Agreement) containing what is often termed a "clear sailing" provision.[1] Such provisions allow counsel for the plaintiff class (class counsel) to seek an award of

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections III.B. and III.C.

[1] See *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 32; *Weinberger v. Great Northern Nekoosa Corp.* (1st Cir. 1991) 925 F.2d 518, 520, fn. 1.

attorney fees from the trial court, with the assurance that the defendant will not oppose the fee application if the amount sought is less than or equal to a specified dollar amount. The issues raised on appeal in the present case arise from an additional clause in the Agreement, which required class counsel to accept, in full satisfaction of their right to attorney fees, either the maximum specified in the clear sailing provision, or the amount awarded by the trial court, whichever was less. A parallel provision permitted the named plaintiff and class representative (Ruiz) to seek an incentive payment of up to a certain amount without opposition, but required Ruiz to accept the lesser of the maximum specified in the agreement or the amount awarded by the court.

The trial court approved the Agreement, but entered an order (the fee order) awarding attorney fees and an incentive payment in amounts that were only a fraction of those requested by class counsel and Ruiz (collectively claimants). Claimants indicated that they intended to appeal the fee order. In response to a motion by the defendants (collectively CSAA[2]) to enforce the settlement by precluding claimants from filing an appeal, the court interpreted the Agreement not to include a waiver of the right to appeal.

In the published portion of this opinion, we agree with the trial court that the language of the Agreement is not sufficiently clear and explicit to establish a waiver of claimants' right to appeal the fee order. We also reject CSAA's contention that claimants' appeal was improperly taken from a consent judgment. We further hold that under the circumstances of this case, class counsel have standing to appeal the fee order in their own right.

In the unpublished portion of this opinion, we conclude based on the record before us that in determining the amount of attorney fees and incentive payment to award, the trial court appears to have applied legally incorrect standards, thereby abusing its discretion. We therefore reverse the fee order and remand for further proceedings.

---

[2] The defendants named in the complaint were California State Automobile Association Inter-Insurance Bureau and California State Automobile Association. Both defendants changed their corporate names during the pendency of the litigation. For convenience, we will refer to defendants collectively as CSAA.

## II.

### FACTS AND PROCEDURAL BACKGROUND

### A.  Proceedings Prior to Settlement

Because the merits of this case were resolved by settlement, we discuss the underlying factual allegations only to the extent necessary to provide a background for the parties' contentions on appeal.  Ruiz's initial complaint, filed on January 16, 2007, pleaded causes of action for unfair business practices (Bus. & Prof. Code, § 17200, et seq.), false advertising (Bus. & Prof. Code, § 17500 et seq.), breach of contract, fraud and deceit, negligent misrepresentation, and unjust enrichment.  These causes of action were all based on the contention that CSAA falsely stated or suggested to its automobile and homeowners insurance customers who paid their premiums on an installment basis that credit was being extended to them, and improperly billed these customers for "disguised premiums falsely labeled as 'finance charges.' "

On February 27, 2009, Ruiz amended his complaint to allege additional causes of action based on the federal Truth In Lending Act (TILA, 15 U.S.C. § 1601 et seq.); the Unruh Act (Civ. Code, § 1801 et seq.); various specified provisions of the California Insurance Code; and an alleged special duty owed by California insurers to their insureds. The amended complaint was based essentially on the same facts alleged in the initial complaint, though in more detail, and included the causes of action previously pleaded. The gravamen of the amended complaint was that when CSAA's insurance customers chose to pay for their CSAA-issued insurance policies on a monthly installment basis, CSAA did not accurately inform them regarding the cost of doing so, and sent them billing statements that included false and misleading information regarding CSAA's finance charges.

At the outset of the case, the parties performed substantial discovery.  With the approval of the trial court, they then stipulated that the issue of class certification would be postponed, and identified specific claims and issues that would be submitted to the trial court to be resolved seriatim in phased non-jury trials.  After the first such trial, held

3

on July 30, 2008, the court ruled that neither TILA nor the Unruh Act applied to CSAA's practice of charging interest on insurance premiums when paid in installments.

The parties then attempted mediation, but were not successful in resolving the case. A second bench trial was held on July 31, 2009, regarding whether various specific provisions of California law required CSAA to disclose to policyholders the dollar amount of the finance charges they would incur if they paid for their policies in installments, and/or to reimburse a portion of finance charges previously paid if the policy was cancelled. Once again, the trial court found in favor of CSAA on these issues.

After a second mediation also failed, the parties and the trial court set a date for a third and final bench trial on the remaining issues in the case. The issues to be resolved in this last phase included: (1) the legality of CSAA's alleged practice of billing policyholders for only 50 percent of the remaining premium in the 12th month of their annual billing cycle, in order to impose a finance charge in the amount carried forward; (2) the accuracy of CSAA's representations to its policyholders on its billing practices and interest charges, including whether CSAA's billing plan explanation form was confusing and misleading with respect to policyholders' right to cancel their policies; and (3) whether CSAA had misled policyholders regarding finance charges in other respects.

After preparing for the final trial phase, however, the parties agreed to undertake a third round of mediation. That round was successful, so the trial was taken off calendar pending trial court approval of the settlement embodied in the Agreement resulting from the mediation.

### B. Settlement Agreement

The Agreement provided that CSAA would make up to $6.5 million available to class members who submitted valid and timely claims. Each such class member would receive 84 cents per policy for each policy year during the class period when the class member paid finance charges to CSAA. Any settlement funds not claimed would remain the property of CSAA. In addition, the agreement provided CSAA's insurance customers with various forms of nonmonetary relief. CSAA agreed to make available on its website, and publicize to policyholders, "an accurate payment estimator" that would

4

enable policyholders to determine how much their monthly payments and finance charges would be if they chose to pay for their policies in installments. CSAA also agreed to modify its billing documents to address the alleged inadequacies identified in the lawsuit. The parties estimated the value of this nonmonetary relief to be at least $3 million. CSAA also agreed to pay the costs of giving notice to the class, administering the settlement, and distributing the settlement funds.

The Agreement included a provision giving class counsel the right to seek an award of attorney fees from the trial court, with the assurance that CSAA would not oppose the fee application if the amount sought did not exceed $2.32 million. The Agreement also required class counsel to accept, in full satisfaction of their right to attorney fees, either the maximum specified in the clear sailing provision, or the amount awarded by the trial court, whichever was less. A parallel provision permitted Ruiz to seek an incentive payment of up to $10,000 without opposition, but required Ruiz to accept a lesser amount if so awarded by the court. The Agreement also provided that class counsel's compensation would be derived entirely from the court-awarded fees and costs, and that neither defendants nor the plaintiff class members would have any obligation to pay class counsel any additional amounts.

## C. Subsequent Proceedings in the Trial Court

After notice was given to the class members, the trial court approved the settlement terms incorporated into the Agreement. The court then held a hearing on claimants' written requests for $2.32 million in attorney fees and costs, and an incentive payment of $10,000. As contemplated by the Agreement, CSAA did not oppose these requests. Nonetheless, the trial court's fee order awarded attorney fees and an incentive payment in amounts considerably less than class counsel and Ruiz requested: $350,000 for attorney fees (plus $60,670 for costs), and $1,250 for the incentive payment.

After the entry of the fee order, claimants indicated informally that they intended to appeal the trial court's attorney fee and incentive payment awards. CSAA then filed a motion to enforce the Agreement, requesting that the trial court interpret the Agreement

5

to include a waiver of claimants' right to appeal.  The trial court declined to give the agreement the interpretation advocated by CSAA.

After judgment was entered based on the trial court's approval of the Agreement, claimants timely appealed from the fee order.  CSAA filed a timely separate appeal from the trial court's order rejecting CSAA's argument that claimants had waived their rights to appeal.  The appeals were consolidated in this court.

## III.

### DISCUSSION

### A.  Threshold Procedural Issues

#### 1.  Waiver of Right to Appeal

Given the absence of any conflicting extrinsic evidence regarding the provisions of the written Agreement, our review of the trial court's interpretation is de novo. (*Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 196.) The governing law is well established.  "The terms of a contract are determined by objective rather than by subjective criteria.  The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe.  [Citations.]"  (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [applying quoted rule to interpretation of oral stipulation entered into on the record during court hearing]; accord, *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 ["The parties' undisclosed intent or understanding is irrelevant to contract interpretation"]; see generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 116, 117, pp. 155-157.)

CSAA argues that the provision in the Agreement requiring claimants to accept the lesser of the amount specified in the agreement, or the amount awarded by the trial court, constituted an implied waiver of their right to appeal from the trial court's order. Claimants contend that in order to be effective, a contractual waiver of the right to appeal must be clear and explicit, and that the language of the Agreement in this case does not satisfy those criteria.

6

The most recent case cited by the parties involving a claimed waiver of the right to appeal is *Guseinov v. Burns* (2006) 145 Cal.App.4th 944, overruled on another ground by *Haworth v. Superior Court* (2010) 50 Cal.4th 372 (*Guseinov*). In *Guseinov*, the parties to litigation arising from a failed business relationship entered into a settlement agreement in which they agreed to submit their dispute to final and binding arbitration. The agreement provided that "The Parties waive any right to appeal the arbitral award; to the extent a right to appeal may be lawfully waived. Each Party retains the right to seek judicial assistance: (i) to compel arbitration; (ii) to obtain interim measures of protection prior to or pending arbitration; (iii) to seek injunctive relief . . . , and (iv) to enforce any decision of the arbitrator, including the final award." (*Id.* at p. 948.) The arbitrator entered an award, and the parties filed cross-petitions in the trial court, the plaintiff seeking to confirm the award and the defendant seeking to vacate it. The trial court granted the petition to confirm and denied the petition to vacate, and the defendant appealed. On appeal, the plaintiff argued that the appeal was precluded by the waiver clause in the settlement agreement.

*Guseinov* held that the agreement did not preclude the appeal. The court acknowledged that "[i]t is well settled, and defendant correctly concedes, that a party can waive the right to appeal. [Citations.] The Courts of Appeal have held, however, that any waiver of the right to appeal must be clear and express . . . . [Citations.] Moreover, any doubt will be resolved against a waiver of the right to appeal. [Citations.]" (*Guseinov*, *supra*, 145 Cal.App.4th at pp. 952-953, italics omitted.)

The *Guseinov* court illustrated how this principle was applied by contrasting two prior cases. The first was *Reisman v. Shahverdian* (1984) 153 Cal.App.3d 1074 (*Reisman*), in which an attorney sued clients for unpaid bills, and they agreed to arbitrate under a statute giving the clients the statutory right to a trial de novo after arbitration. The arbitration agreement included a provision that "[n]o appeal or further proceedings will be possible after the arbitration award is made." (*Id.* at p. 1082, italics omitted.) *Reisman* held that this language waived only the right to a trial de novo, and not the right to appeal from the order confirming the award. "Without greater specificity in the waiver

7

agreement language, we hold it was not effective to waive rights to appeal trial court judicial action which was expressly provided for by [statute.]" (*Id.* at pp. 1088-1089.)

The second case discussed in *Guseinov*, *supra*, was *Pratt v. Gursey, Schneider & Co.* (2000) 80 Cal.App.4th 1105 (*Pratt*). In *Pratt*, the parties entered into an arbitration agreement providing that " 'the right to appeal from the arbitrator's award or any judgment thereby entered or any order made is expressly waived.' " (*Pratt*, *supra*, 80 Cal.App.4th at p. 1107.) After the arbitration, the trial court entered a judgment confirming the arbitration award, and the losing party appealed. The appeal was dismissed by the same court that later decided *Guseinov*, based on the finding that the parties' agreement included an express waiver of the right to appeal. The court reasoned that "[t]he broad language utilized by the parties constitutes a waiver of the right to appeal from 'any judgment' or 'any order.' . . . [T]he right to appeal 'any judgment' or 'any order' has been expressly waived." (*Pratt*, *supra*, 80 Cal.App.4th at p. 1110.)

The *Guseinov* court concluded that the clause in the case before it was more like the one in *Reisman* than *Pratt*. Although the parties in *Guseinov* had agreed to waive the right to appeal the arbitration award itself, they had " 'retain[ed] the right to seek judicial assistance' " in *enforcing* it. "Therefore, the appeal waiver does not prevent a party from filing a motion or petition to secure a judgment on the arbitration award. Moreover, the parties clearly contemplated that a petition to vacate or enforce the arbitration award would be permitted." (*Guseinov*, *supra*, 145 Cal.App.4th at p. 954.) The court also noted that in agreeing California law would apply, the parties had carved out an exception for a provision dealing with discovery in arbitration proceedings. However, the parties did *not* make a similar exception for the statute providing that a judgment enforcing or declining to enforce an arbitration award is appealable. (*Id.* at pp. 954-955.) The court concluded that "[a]bsent greater specificity, the arbitration clause cannot be construed to waive an appeal from a judgment entered on an award. [Citations.]" (*Id.* at p. 955.)

*Guseinov*, *Reisman*, and *Pratt* are examples of the general principle that waivers of the right to appeal must be clear and explicit, and of the application of that principle in one particular factual context, i.e., purported waivers of the right to appeal a judgment on

8

an arbitration award. (See *Reisman*, *supra*, 153 Cal.App.3d 1074; *Guseinov*, *supra*, 145 Cal.App.4th at p. 952; *Pratt*, *supra*, 80 Cal.App.4th at p. 1110.) None of those cases, however, arose from the settlement of a consumer class action.

*McConnell v. Merrill Lynch, Pierce, Fenner &Smith, Inc.* (1985) 176 Cal.App.3d 480 (*McConnell*) does fall into that category. There, the trial court approved a settlement agreement under which the defendant agreed to create a fund in a specified amount for the payment of claims by the plaintiff class members, as well as attorney fees and costs. During the settlement approval process, the defendant agreed that if there was money remaining in the settlement fund after the payment of claims, fees, and costs, the trial court would have absolute discretion regarding whether to refund the excess to the defendant, or increase the amounts to be paid to the class members who had filed claims. The resulting agreement stated that " 'the decision of the Court . . . to exercise its discretion to increase the amounts to be paid to the class claimants . . . shall not be appealable by any of the parties to this Settlement Agreement.' " (*Id.* at p. 486.) Given this language, it is not surprising that when the defendant later attempted to appeal the trial court's ruling, the court held that the defendant had waived its right to appeal, and dismissed. (*Id.* at pp. 488-489.) *McConnell*, however, involved language far more explicit than the "agree to accept" provision used in the Agreement in the present case, even taking into account the "in full satisfaction" proviso added as to class counsel.

Of all of the cases cited in the briefs or revealed by our research, the one with the contractual language most analogous to that used in the Agreement in this case is *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48 (*Lovett*). In that case, an auto accident victim sued the driver of the truck that rear-ended his vehicle. Four different medical care providers obtained liens on the victim's recovery in the case. At a settlement conference at which the medical lienholders were not present, the victim settled for $125,000, contingent on there being $50,000 left over for him after the payment of the medical liens, attorney fees, and costs. The court set a hearing to determine what each lienholder would receive. The lienholders " 'agreed to be bound by the decision of [the trial] Court without need of further litigation bringing closure to the entire matter.' " (*Id.* at p. 53.)

9

The victim argued that each lienholder's claim should be reduced to reflect a pro rata share of his attorney fees and costs. The trial court agreed, based on the common fund doctrine, and the lienholders appealed. The victim argued that the lienholders had waived their right to appeal. The court held that the agreement to be " 'bound by the [trial court's] decision . . . without need of further litigation' " was ambiguous, because it could be interpreted to mean the lienholders were agreeing only that they would not file a separate action to determine their respective rights, as opposed to agreeing not to appeal. Accordingly, the Court of Appeal found the quoted language insufficient to constitute an express waiver of the right to appeal. (*Lovett*, *supra*, 63 Cal.App.4th at p. 53.)

In our view, the language in the Agreement in the present case is equivalent to that used in *Lovett*, *supra*, 63 Cal.App.4th 48, in that it sets forth the parties' agreement to accept a ruling to be made by the trial court, but does not expressly state that the parties are waiving their right to appeal that ruling. The cases discussed above, read together, stand for the proposition that if the parties to a contract want their agreement to encompass a waiver of the right to appeal from an anticipated judicial ruling, they must say so explicitly and unambiguously; they cannot leave their intent to be inferred from the language of the agreement. Accordingly, our independent review of the Agreement here leads us to agree with the trial court that, as a matter of law, it does not establish a waiver of claimants' right to appeal the trial court's ruling on the amount of attorney fees and incentive payment warranted in this case.

### 2. *Appeal from Consent Judgment*

CSAA next argues that claimants' appeal is improper because it was taken from a consent judgment. As claimants' notice of appeal makes crystal clear, however, their appeal was *not* taken from the judgment, but solely from the fee order, which is a separate document from the judgment, although it is referenced in the judgment and was entered on the same date.

CSAA cites *City of Gardena v. Rikuo Corp.* (2011) 192 Cal.App.4th 595 (*Gardena*) for the proposition that an appeal cannot be taken after the entry of a consent judgment, even if that appeal is from an order entered separately from the judgment.

However, the consent judgment in *Gardena* stated that "it was intended to resolve all of the issues in controversy between the parties." (*Id.* at p. 603.) In the present case, in contrast, the Agreement that was incorporated into the consent judgment expressly left open the amounts of the attorney fees and incentive payment, and provided that those amounts would be set by the trial court, up to a specified maximum.

In *Water Replenishment Dist. of Southern California v. City of Cerritos* (2012) 202 Cal.App.4th 1063, 1069-1070 (*Water Replenishment*), the court distinguished *Gardena*, *supra*, 192 Cal.App.4th 595 on the point for which CSAA cites it. *Water Replenishment* involved a consent judgment that "expressly reserved jurisdiction unto the [trial] court to 'redetermine' matters . . . ." (*Water Replenishment*, *supra*, 202 Cal.App.4th at pp. 1069-1070.) The court held that an order entered after the consent judgment, in the exercise of the trial court's reserved jurisdiction, could be appealed even though the original judgment was entered by consent. (*Id.* at p. 1070.) Similarly, in the present case, where the Agreement expressly contemplated further court proceedings and a separate ruling on the attorney fee and incentive payment issues, *Gardena* is distinguishable. Accordingly, we reject CSAA's argument that the fee order was not appealable because it was part of a consent judgment.

### 3. Class Counsel's Standing to Appeal Fee Order

Claimants' notice of appeal names both Ruiz and class counsel as appellants. Code of Civil Procedure section 902 provides for appeals to be filed only by a "party aggrieved" by the judgment or order from which the appeal is taken. Based on this statutory language, CSAA argues that because counsel are not *parties* to actions in which they represent a client, class counsel in this case do not have standing to appeal, in their own right, from the trial court's order setting the amount of the fees to be awarded to them.

In support of this contention, CSAA relies primarily on *In re Marriage of Tushinsky* (1988) 203 Cal.App.3d 136 (*Tushinsky*). *Tushinsky*, in turn, relied on two earlier cases, *Meadow v. Superior Court* (1963) 59 Cal.2d 610 (*Meadow*), and *Marshank v. Superior Court* (1960) 180 Cal.App.2d 602 (*Marshank*). None of these cases,

11

however, involved the situation presented by the current case, where counsel representing the plaintiffs in a class action seek to appeal an award of attorney fees made under a fee-shifting statute designed to promote the public interest.

Our Supreme Court addressed precisely our circumstances in *Flannery v. Prentice* (2001) 26 Cal.4th 572 (*Flannery*). In *Flannery*, the successful plaintiff in an employment discrimination case contended that she, rather than her counsel, was entitled to the bulk of the attorney fee award made by the trial court under the fee-shifting provision in the Fair Employment and Housing Act (FEHA). (Gov. Code, § 12965.) The client contended she had an agreement with her counsel limiting their compensation to a contingency fee of 40 percent of the damages. The trial court's statutory fee award amounted to more than the contingency fee would have been, and the client claimed the fee agreement entitled her to retain the excess amount. Counsel denied that their agreement with the client included such a provision. The Supreme Court granted review to decide "whether a party may receive or keep the proceeds of a fee award when she has neither agreed to pay her attorneys nor obtained from them a waiver of payment." (*Id.* at pp. 580-581.)

In considering that question, the court acknowledged that the statute authorizes fee awards to the prevailing *party,* but opined that this "language does not unambiguously favor plaintiff. 'The word "part[y]" is reasonably susceptible to more than one interpretation.' [Citation.] 'In the countless procedural statutes in which the term "party" is used, it is commonly understood to refer to either the actual litigant or the litigant's attorney of record. [Citations.] Since that is the ordinary import of the term, that is the meaning we must ascribe to it when used in [a statute], unless the Legislature has clearly indicated a contrary intent . . . .' [Citations.]" (*Flannery*, *supra*, 26 Cal.4th at p. 578, fn. omitted.)

More significantly, in deciding whether counsel or the client was entitled to the statutory attorney fee award, *Flannery* considered the policy behind the FEHA fee-shifting provision. The court concluded that "were we to interpret [Government Code] section 12965 as plaintiff urges, vesting ownership of fees awarded thereunder and not disposed of by contract in the litigant, rather than in counsel, we would diminish the

12

certainty that attorneys who undertake FEHA cases will be fully compensated, and to that extent we would dilute section 12965's effectiveness at encouraging counsel to undertake FEHA litigation. Such an interpretation of section 12965, thus, ultimately would tend to undermine the Legislature's expressly stated purpose of FEHA 'to provide effective remedies that will eliminate these discriminatory practices.' (Gov. Code, § 12920.)" (*Flannery*, *supra*, 26 Cal.4th at p. 583.) The court also described a number of public policy considerations favoring the attorneys' position, and concluded that in the absence of a contract expressly providing otherwise, an attorney fee awarded under a public interest fee-shifting belongs to counsel, not the client.[3] (*Id.* at pp. 584-590.) Indeed, the court noted that as early as 1982, it was " 'established' " that "an attorney fee award under Code of Civil Procedure section 1021.5, which codifies the 'private attorney general' fee doctrine, . . . [is] 'properly made to plaintiffs' attorneys rather than to plaintiffs themselves.' [Citation.]" (*Flannery*, 26 Cal.4th at p. 582, fn. omitted, citing *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 682 & fn. 26.)

For these reasons, we are not convinced by CSAA's contention that class counsel's appeal in the present case is precluded by the use of the word "party" in Civil Code section 902 to describe the persons entitled to file an appeal. In so holding, we recognize that *Flannery* did not involve the issue of standing to appeal, because the appeal in that case was taken from the judgment in a separate action filed by the client against her counsel. (See *Flannery*, *supra*, 26 Cal.4th at pp. 576-577.) Nonetheless, the reasoning and language of the case lead us to reject CSAA's position that class counsel have no standing to appeal from the fee order.

In a later case, *Lindelli v. Town of San Anselmo* (2006) 139 Cal.App.4th 1499 (*Lindelli*), Division Five of this court took *Flannery* to the next logical step, holding that

---

[3] In the present case, the Agreement expressly provides that neither Ruiz nor the class members are obligated to pay any compensation to class counsel. Thus, class counsel have a direct financial stake in the fee award, whereas the interest of Ruiz and the class members is, at most, an intangible one: the principle of adequate compensation for counsel who represent successful plaintiffs in consumer class actions.

counsel seeking an attorney fee award under a public interest fee-shifting statute have standing to *intervene*.[4] *Lindelli* involved a challenge under the Elections Code to a town's handling of its waste management services contract. After the conclusion of the litigation on the merits, the plaintiffs expressly *declined* to seek an attorney fee award. The attorneys who had represented the plaintiffs moved to intervene in order to seek a fee award, and the trial court denied the motion. The attorneys' appeal from the denial of their motion to intervene thus presented the question whether "attorneys acting on their own behalf can intervene in a client's lawsuit and move for attorney fees" under Code of Civil Procedure section 1021.5 (section 1021.5), the private attorney general statute. (*Id.* at p. 1501.)

The Court of Appeal held that the attorneys should have been permitted to intervene, summarizing its reasoning as follows: "Resolution of the issue presented is directed by *Flannery v. Prentice* [citation]. In *Flannery*, the California Supreme Court held that, absent an agreement allocating fee awards to the client, fees awarded under the Fair Employment and Housing Act 'belong to the attorneys who labored to earn them.' [Citation.] The court departed from federal precedent and construed 'prevailing party' in Government Code section 12965 to refer to either a litigant or its counsel. [Citation.] Following the reasoning of the *Flannery* decision, we hold that [the attorneys have] standing to move for fees and sufficient interest in an award of attorney fees under section 1021.5 to support permissive intervention . . . ." (*Lindelli*, *supra*, 139 Cal.App.4th at p. 1502.)

*Lindelli* also discussed, and distinguished, the two cases relied on in *Tushinsky*, *supra*, 203 Cal.App.3d 136, as the basis for its holding that attorneys do not have standing to seek or challenge an order awarding them fees. (*Lindelli*, *supra*, 139

---

[4] We are somewhat perplexed that, despite the obvious relevance of *Flannery*, *supra*, 26 Cal.4th 572, and *Lindelli*, *supra*, 139 Cal.App.4th 1499, to the issue of class counsel's standing to bring the instant appeal, neither of these cases is discussed or even cited in any of the briefs filed in this appeal. In light of these omissions, we notified counsel prior to oral argument that we wished them to be prepared to address these authorities during oral argument.

14

Cal.App.4th at pp. 1510-1512.)  As the *Lindelli* court pointed out, both of those cases—*Meadow*, *supra*, 59 Cal.2d 610, and *Marshank*, 180 Cal.App.2d 602—were marital dissolution matters in which attorneys sought fee awards "under statutory provisions authorizing courts to require a spouse to pay attorney fees necessary to allow the other spouse to maintain divorce or support actions.  [Citations.]"  (*Lindelli*, *supra*, 139 Cal.App.4th at p. 1510.)  The *Lindelli* court's research revealed no published authority in which a California court had relied on the holding of *Meadow* and *Marshak* to "deny[] intervention to counsel seeking fees under section 1021.5, or any other provision providing for fee shifting in cases which vindicate fundamental public policies.  [Citation.]"  (*Lindelli*, *supra*, 139 Cal.App.4th at p. 1511.)

As *Lindelli* pointed out, the various fee-shifting statutes applicable to public interest litigation reflect a different legislative intent than the statutory scheme permitting court-ordered fee-shifting in marital dissolution cases.  Because "the fee provision in the marital dissolution context is intended for the benefit of the spouses, the attorney's claim for fees arises from the attorney's employment relationship and it is the attorney who must enforce any contractual lien on the recovery through an independent action against the client.  [Citations.]  In contrast, [a public interest attorney's] interest in the fee award arises from section 1021.5 itself.  Under *Flannery* [citation], the attorney is entitled to fees awarded unless an agreement specifies otherwise."  (*Lindelli*, *supra*, 139 Cal.App.4th at p. 1512.)

Thus, the *Lindelli* court reasoned, the policy behind section 1021.5 is best served by recognizing the attorneys' right to litigate their right to a fee award on their own behalf.  "Were we to interpret section 1021.5 as precluding intervention and an attorney's request for fees where the client declines to move for a fee award, we would diminish the certainty that attorneys who undertake public interest cases will receive reasonable compensation and dilute section 1021.5's effectiveness at encouraging counsel to undertake litigation enforcing important public policies.  [Citation.]  Were we to adopt respondents' position it would also provide a windfall to the wrongdoing defendant, at

15

the expense of the attorneys who labored in the public interest.  [Citations.]”  (*Lindelli*, *supra*, 139 Cal.App.4th at pp. 1512-1513.)

We recognize that *Lindelli* is not controlling here, because of two significant differences in the procedural posture of the two matters.  In *Lindelli*, the underlying claims was litigated to judgment on the merits, not settled.  Indeed, the *Lindelli* court expressly declined to determine whether it would have reached the same result in the context of a motion to intervene that posed a risk of interfering with a settlement on the merits.  (See *Lindelli*, *supra*, 139 Cal.App.4th at p. 1513, fn. 10.)  Moreover, the plaintiffs’ attorneys in *Lindelli* moved to intervene in the trial court and then appealed from the denial of their motion, rather than seeking to appeal on their own behalf without formally intervening or seeking to do so.

Despite these differences, we are persuaded that the analysis in *Lindelli*, *supra*, 139 Cal.App.4th 1499, extending the logic in *Flannery*, *supra*, 26 Cal.4th 572, leads inexorably to the conclusion that class counsel have standing, in their own right, to litigate the amount of attorney fees, both in the trial court and on appeal.[5]  Accordingly, we shall proceed to address the merits of claimants’ contentions about the inadequacy of the attorney fee award and incentive payment.

## B.  Attorney Fees

### 1. Applicable Law and Standard of Review

“[T]he fee setting inquiry in California ordinarily begins with the ‘lodestar,’ i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate.  ‘California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys’ fee award.’  [Citation.]”  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*).)  “[I]n the absence of ‘circumstances rendering an award unjust, an attorney fee award should ordinarily include compensation for all the hours

---

[5]  Because we have concluded that class counsel have standing to appeal on their own behalf in this case, we need not and do not reach the question of whether their client, Ruiz, also has standing to appeal on their behalf.

reasonably spent, including those relating solely to the fee. [Citation.]' [Citation.]" (*Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1394, italics omitted.) "The reasonable hourly rate is that prevailing in the community for similar work. [Citations.] The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary. [Citation.]" (*PLCM Group*, *supra*, 22 Cal.4th at p. 1095.)

"The trial judge ultimately has discretion to determine the value of the attorney services. 'However, since determination of the lodestar figure is so "[f]undamental" to calculating the amount of the award, the exercise of that discretion must be based on the lodestar adjustment method.' [Citation.]" (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.)

" 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion.' " (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175, quoting *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142; accord, *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1003 (*Heritage Pacific*).) However, the trial court's " 'discretion must not be exercised whimsically, and reversal is appropriate where there is no reasonable basis for the ruling or the trial court has applied "the wrong test" or standard in reaching its result.' [Citation.]" (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 92.) Thus, an attorney fee award may be overturned on the basis of " 'a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence. [Citations.]' [Citation.]" (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 894.)

For example, in *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, the trial court began with the lodestar amount and multiplied it by the requested 1.5 enhancement, but then divided that total by 185, because the success of the lawsuit had generated only 3,000 signatures out of 556,000 (1/185th) needed to qualify an initiative for the ballot.

17

(*Id*. at p. 323.) The California Supreme Court found that this "arbitrary formula," which "reflect[ed] only the trial judge's view of the results achieved by the litigation," constituted "a palpable abuse of discretion," because there was "no reasonable connection between the lodestar figure and the fee ultimately awarded." (*Id*. at pp. 322-324.) Thus, although the trial court has considerable discretion in determining what hours to include in the lodestar and whether to adjust it, either upward or downward, that discretion does not encompass the use of a method that arbitrarily severs the connection between the attorneys' efforts and their ultimate compensation.

"[O]ur Supreme Court has repeatedly observed that a lodestar figure may be adjusted not just upward but also, where appropriate, downward. [Citations.]" (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 840, italics omitted (*Thayer*); see *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1134.) The lodestar figure may be decreased by looking at the same factors used to increase fees, including " 'the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' [Citation.]" (*PLCM Group*, *supra*, 22 Cal.4th at p. 1096; see *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140, 160-161 (*Graciano*).)

"There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation. [Citation.]" (*Thayer*, *supra*, 92 Cal.App.4th at p. 834.) Nonetheless, the ultimate number must have a reasonable basis; it cannot be "snatched whimsically from thin air." (*Gorman v. Tassajara Development Corp.*, *supra*, 178 Cal.App.4th at p. 101.)

### *2. Trial Court's Rationale for Amount Awarded*

Class counsel moved for an award of attorney fees and costs totaling $2.32 million, which was the figure specified in the "clear sailing" provision of the Agreement. Class counsel's declarations indicated that they had spent almost 4,500 hours on the litigation, and their motion proposed a "lodestar" fee amount of $2.26 million, with essentially no multiplier, plus costs in the amount of $60,670.

The trial court found that the hourly rates charged by the various professionals who worked on the case were reasonable.[6]  Nonetheless, the trial court awarded attorney fees of $350,000.  At the hearing on the fee amount, the court stated that its decision would "start with a lodestar analysis," and that "the value of the settlement" would be "the second level of analysis."  The court then stated: "It is my tentative view that all of the work conducted by plaintiff's counsel through the conclusion of the second-phase trial resulted in a loss, and that, therefore, just like contingency fee lawyers, should not be paid for."  The court opined that "one of the key factors, the whole point of a lodestar analysis[] is to render class counsel in the same position they would be as if they handled this case on a contingency fee case," in which "[i]f you don't win, you don't collect."  Accordingly, the court indicated that because "there were no victories whatsoever in phase one and phase two," the court was "tentatively valuing . . . that time at zero."

Thus, in making the fee award, the trial court focused exclusively on the work done after the conclusion of the second bench trial.  The court "did the best that [it] could to figure out how much of the . . . lodestar time [was] attributable" to that part of the case, and "came up with $350,000, being generous."

Moving on to "the second level of analysis"—that is, to "focus on the value of the settlement"—the trial court proceeded to compare the lodestar amount of $350,000 to "the percentage of the pot"—that is, to the monetary relief obtained by the class.  In that regard, claimants contended that the dollar amount by which the fee award's reasonableness should be measured was $6.5 million, the total potential recovery under the Agreement.  The trial court rejected this, stating that the appropriate number was "how much was actually received by the class members."  The court noted that although the Agreement obligated CSAA to pay class members up to $6.5 million, the maximum available to an individual class member was 84 cents per policy year.  The court opined that most people "wouldn't believe that to be of any value to them whatsoever."

---

[6]  The trial court also found that the expenses for which class counsel requested reimbursement were reasonable and supported by the evidence.  The fee order awarded the full amount of costs and expenses requested.

Accordingly, the court used the amount paid on the claims that were actually made, which was approximately $1.1 million, making the $350,000 attorney fee award "about a third" of the claims made.

Class counsel pointed out that the court's analysis of the value of the settlement did not take into account any of the nonmonetary benefits included in the Agreement. As an example, class counsel noted that the Agreement required CSAA to provide its insureds with specified information about its interest rate calculations on premiums, even though the trial court's interim rulings had rejected Ruiz's arguments that CSAA was legally required to disclose this information. Counsel also noted that but for the settlement, the interim rulings would have been subject to appeal, and that a reversal on appeal would have resulted in "a potential for a substantial recovery against CSAA." In response, the trial court acknowledged that "the first and most important component of an attorney fee request is a lodestar analysis," but added that "looking at the percentage of the pot is a way of further analyzing." The court clarified that the $350,000 award was intended to compensate class counsel for "everything that [they] did, including the nonmonetary portion of the settlement," and "was a fair representation of what was done to bring about the total result that was achieved[,] based first on the quantity of time claimed." With that, the court affirmed its ruling awarding $350,000 in attorney fees.

### 3. Analysis

The trial court's rationales for its reductions to the lodestar in the present case were based on its view that (1) class counsel were not entitled to be compensated for any of the hours expended on the case prior to the conclusion of the second bench trial (the trial phase hours), because they were unsuccessful on all of the issues actually tried; and (2) the appropriate benchmark against which to measure the fee award was the monetary damages actually claimed by the plaintiff class members, rather than the full amount set aside to pay claims.

As to the first of the trial court's rationales, it is settled law that in a fee-shifting case, the degree of the prevailing party's success in achieving its litigation objectives is an appropriate factor to consider in valuing the legal services rendered by counsel to that

20

party. (*PCLM Group*, *supra*, 22 Cal.4th at p. 1096; *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 454, criticized on another ground by *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418.) Thus, a trial court is entitled to "reduce the amount of the attorney fees to be awarded where a prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit." (*Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 249.) However, "attorney fees should not be reduced solely because a litigant did not succeed on all claims or theories." (*Hogar Dulce Hogar v. Community Development Com. of City of Escondido* (2007) 157 Cal.App.4th 1358, 1369 (*Hogar*).)

Thus, when a fee-shifting statute applies only to some of the claims in a case, and the plaintiff has achieved a successful result on some claims but not on others, hours spent on claims *unrelated* to those on which the party was successful may be excluded from the lodestar calculation. However, " ' "[a]ttorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed" . . . [or] when the issues in the fee and nonfee claims are so inextricably intertwined that it would be impractical or impossible to separate the attorney's time into compensable and noncompensable units.' [Citation.]" (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 417 (*Harman II*), quoting *Graciano*, *supra*, 144 Cal.App.4th at pp. 158-159, fn. omitted.)

Similarly, when all of the claims in a case are subject to a fee-shifting statute, "[i]t is only when a plaintiff has achieved limited success or has failed with respect to *distinct and unrelated* claims, that a reduction from the lodestar is appropriate. [Citation.]" (*Hogar*, *supra*, 157 Cal.App.4th at p. 1369, italics added.) In fee-shifting cases, " '[w]here a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the [trial] court did not adopt each contention raised.' [Citation.]" (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431, criticized on another ground by *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952.) Nonetheless, where a plaintiff has achieved only limited success, the lodestar

21

figure may be reduced by subtracting hours spent on claims that were entirely *unrelated* to those on which the plaintiff was successful. In addition, where the overall relief obtained by the plaintiff was limited, the lodestar amount may be adjusted to reflect the significance of the overall relief obtained in relation to the hours reasonably expended. (*Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1310-1312 (*Harman I*); see *Hensley v. Eckerhart* (1983) 461 U.S. 424, 434-435 (*Hensley*).)

In the present case, the record does not reflect any effort by the trial court to determine how much of the time expended by class counsel during the trial phase was spent on issues *related* to the ones resolved by the settlement. Rather, at the hearing, the trial court stated that "[I] did the best that I could to figure out how much of the . . . lodestar time is attributable to post-phase-two trial, and I came up with $350,000, being generous." It does not appear from the record that in doing so, the trial court took into account the degree of factual and legal relationship or overlap, if any, between the issues litigated in the two bench trials, and the issues that remained unresolved at the time of the settlement. As shown by the foregoing discussion of the case law, if the issues were factually and/or legally related—as appears likely from a reading of the first amended complaint—it was an error of law, and therefore an abuse of discretion, to exclude *all* of the trial phase hours from the lodestar calculation, based on solely on the fact that those hours were expended prior to the end of the second phase, without any attempt to assess how much of the work included in those hours ultimately contributed to the relief obtained by the plaintiff class under the Agreement.[7]

There is an important policy distinction between counsel who enforce rights belonging to a large class, or the public in general, and contingency fee attorneys who litigate matters involving purely individual injuries or damages. (See *Sundance v. Municipal Court* (1987) 192 Cal.App.3d 268, 273 ["It must be remembered that an award of attorneys' fees is not a gift. It is just compensation for expenses actually incurred in

---

[7] In this connection, we note that class counsel's use of "block billing" increased the difficulty of the trial court's task in determining which hours should be included in the lodestar.

vindicating a public right. To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the cost of enforcing that public right."].) Perhaps for that reason, our research has not revealed any published California case in which an appellate court has approved a trial court's wholesale elimination of otherwise compensable attorney hours, reducing the fee award to a small fraction of what would otherwise be the lodestar, on the ground that counsel took the case on a contingency and achieved only partial success. We decline to be the first court to do so.

The trial court's second rationale for the reduction in the lodestar was that the resulting number was appropriate relative to the value of the relief obtained (or, as the trial court more colorfully worded it, as a "percentage of the pot"). The trial court valued that relief as being limited to the $1.5 million actually claimed as damages by class members. However, the appropriate benchmark against which to measure the reasonableness of class counsel's fees is not limited to the actual sum of money recovered. Rather, the measure is "the 'significance of the overall relief obtained by the plaintiff [class] in relation to the hours reasonably expended on the litigation.'. . ." (*Harman II*, *supra*, 158 Cal.App.4th at p. 417, quoting *Hensley*, *supra*, 461 U.S. at p. 435.) Intangible relief that confers a significant benefit on the public, or effectuates a constitutional or statutory policy, may justify a substantial attorney fee award even when the tangible relief achieved in the litigation is insignificant. (See, e.g., *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 233.)

In the present case, the value of the overall relief was not limited to the amount disbursed in payment of the claims filed. In the Agreement, CSAA agreed to adopt specified forms of nonmonetary relief for the benefit of the class, which the parties estimated to have a value of $3 million. Nothing in the record indicates that the trial court took this agreed-upon valuation into account in weighing the significance of the relief against the hours reasonably expended by class counsel. Nor does it appear that the trial court attributed any other objectively reasonable value to the nonmonetary relief.

23

The court did indicate that the award was intended to benefit counsel for their work in obtaining the nonmonetary relief, but did not explain why it believed the amount awarded was sufficient for this purpose.

For all of the above reasons, we reverse the trial court's fee order, and remand for further proceedings regarding the appropriate amount of attorney fees to be awarded to class counsel. On remand, the trial court retains full discretion to reduce the lodestar amount on account of its interim rulings in favor of CSAA. If the court chooses to exercise that discretion, it shall endeavor, with the assistance of counsel, to determine how much of counsel's time was expended on issues *unrelated* to the factual and legal basis on which counsel succeeded in obtaining relief for the plaintiff class members.[8] (See, e.g., *Harman II*, *supra*, 158 Cal.App.4th at pp. 417-418.) The court shall also assess the reasonableness of the hours expended by class counsel against the total overall value to the class of the relief obtained in the settlement, including the nonmonetary relief. Thus, the trial court retains the discretion to adjust the lodestar amount up or down based on this and other factors recognized in the case law.

### C. Incentive Payment Award

Trial courts are authorized to award incentive payments to representative plaintiffs in class actions who lend material support to the prosecution of the case. (See, e.g., *Cellphone Termination Fee Cases* (2010) 186 Cal.App.4th 1380, 1393-1395; *Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 412.) The decision to award an incentive payment to the class representative is within the trial court's discretion. (See, e.g., *In re Mego Financial Corp. Securities Litigation* (9th Cir. 2000) 213 F.3d 454, 462.) In the present case, as already noted, the Agreement provided that CSAA would make such a payment to Ruiz if ordered by the court, and would not

---

[8] Because the burden is on class counsel to demonstrate that their time was spent on compensable tasks, the trial court has the discretion to exclude from the lodestar calculation any hours as to which it is impossible to ascertain whether the work done during those hours contributed to obtaining the relief provided for in the Agreement.

oppose Ruiz's application for such a payment, provided the amount requested did not exceed $10,000.

In support of Ruiz's request for the full $10,000 payment, class counsel informed the trial court that "Ruiz played an active role in assisting [them] in the prosecution of this case over five years." Ruiz was deposed extensively during the discovery phase of the litigation, and also responded to interrogatories and document requests. He also prepared to testify at each of the partial trials in the case, although he did not actually testify at either of the first two trials, and the third was taken off calendar due to the settlement. Nonetheless, the trial court's fee order awarded Ruiz an incentive payment of only $1,250.

At the hearing on attorney fees, after setting forth the rationale for its substantial reduction of the attorney fee amount, the trial court added that Ruiz's incentive payment request was also "too high." The only explanation the trial court gave for this evaluation was that Ruiz "ha[d] to suffer the same fate as did the attorneys regarding the unsuccessful portions of this case." As we have found that the trial court appears to have abused its discretion in reducing the attorney fee award to the extent it did, and the incentive payment was apparently reduced for the same reasons, we conclude it is necessary to reverse the fee order with respect to the incentive payment as well, and remand for reconsideration together with the attorney fees. On remand, the trial court retains the discretion to award whatever amount it deems appropriate after reconsidering the amount of the attorney fee award in light of the views expressed in this opinion.

## IV.

### DISPOSITION

The trial court's ruling on CSAA's motion to enforce the Agreement is AFFIRMED. The order setting the amount of attorney fees awarded to class counsel and amount of the incentive payment awarded to Ruiz is REVERSED, and the matter is remanded for further proceedings as to the award of attorney fees and an incentive payment, consistent with the views expressed in this opinion. On remand, the trial court

25

shall have the discretion to include an additional amount, representing attorney fees for this appeal, in the attorney fee award to class counsel. Ruiz shall recover costs on appeal.


_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
HUMES, J.


A136275 & A136395, *Ruiz v. Calif. State Auto. Assn.*

| | |
|---|---|
| Trial Court: | San Francisco Superior Court |
| Trial Judge: | Hon. Richard A. Kramer |
| Counsel for Appellants in Case No. A136275 and Respondent in Case No. A136395: | Law Offices of George Donaldson, George Donaldson |
| | Daniel Bennett Harris |
| | Carlson Calladine & Peterson, Guy D. Calladine |
| Counsel for Respondents in Case No. A136275 and Appellants in Case No. A136395: | Gordon & Rees, Fletcher C. Alford, Laura L. Geist, and Ryan B. Polk |

A136275 & A136395, *Ruiz v. Calif. State Auto. Assn.*